# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DIVISION OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CATHI TURNER, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 06 C 2399 |
| | ) | |
| HEALTH CARE SERVICE | ) | |
| CORPORATION, and BLUE CROSS | ) | |
| BLUE SHIELD OF ILLINOIS, | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Cathi Turner has problems with her back caused by a 1996 automobile accident. Turner's employment at defendant Health Care Service Corporation ("HCSC") d/b/a Blue Cross Blue Shield of Illinois was terminated after she attempted to take time off after her back problem flared up. HCSC contends that Turner failed to provide appropriate notice for her absence, while Turner asserts that: (1) HCSC terminated her because of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a); (2) HCSC violated the ADA by failing to accommodate her disability, *id*. § 12112(b)(5); (3) HCSC retaliated against her after she exercised her rights under the ADA, *id*. §12203; (4) her termination violated the FMLA, 29 U.S.C. § 2612(a)(1); (5) HCSC retaliated against her for exercising her rights under the FMLA, *id*. § 2615(a)(1); and (6) HCSC terminated her to deprive her of long-term disability benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140.[1]

Turner seeks to strike certain materials submitted by HCSC in support of its motion for summary judgment and HSCS seeks summary judgment as to all of Turner's claims. For the

---

[1] Turner also asserted that HCSC violated the Illinois Personnel Record Review Act, 820 ILCS § 40/2, by not providing a copy of her personnel file upon request. Turner concedes that she did not exhaust her administrative remedies as to this claim and thus moves to dismiss it. That motion is granted.

following reasons, Turner's motion to strike her supervisor's statement that she and other employees took FMLA leave and were not fired is granted and the remainder of Turner's motion to strike is denied. In addition, HCSC's motion for summary judgment is denied as to Turner's FMLA claims and granted as to her ADA and ERISA claims. Finally, Turner's Illinois Personnel Record Review Act claim is dismissed for failure to exhaust.

## I.     Turner's Motion to Strike

At the time of her termination, Turner was a customer service representative at HCSC and Jamie Brickweg was Turner's supervisor and was inquiry supervisor of HSCS's call center. As discussed below, the date and time of certain calls placed by Turner to Brickweg is relevant for purposes of HCSC's motion for summary judgment.

HSCS submitted a declaration from Brickweg wherein Brickweg states, among other things, that she took notes when she received voicemail messages from Turner, and that her notes included the date and time of the call, which were included in the voicemail header, and the subject of the call. In addition, because of the nature of HCSC's work, Brickweg was able to pull a log of all incoming calls to her direct telephone line at HCSC from December 8 through December 14, 2004. The log reflected certain calls from the land line telephone at Turner's apartment, but did not show any calls from Turner's home number prior to 9:30 a.m. on December 8, 9, 10, 13, or 14, 2004, (*i.e.*, within one hour after Turner's 8:30 a.m. shift start time).

Turner seeks to strike Brickweg's declaration, contending that: (1) it improperly contradicts Brickweg's earlier sworn deposition testimony; and (2) several of the statements lack foundation and violate the best evidence rule. Turner also seeks to strike the telephone call log attached to Brickweg's declaration, asserting that it lacks foundation. In response, HCSC

contends that the declaration and supporting materials are proper but submitted a supplemental declaration from Brickweg in an effort to directly address these alleged deficiencies.

### A      Do the Declarations Improperly Contradict Deposition Testimony?

A deponent may not use an affidavit to change her prior deposition testimony. *Miller v. A.H. Robins Co.,* 766 F.2d 1102, 1104-05 (7th Cir. 1985). However, a deponent may submit an affidavit if it explains her prior deposition testimony or addresses newly discovered evidence. *Id*. at 1104.

Turner first contends that Brickweg's statements about the dates and times of voicemail messages left by Turner contradict her deposition testimony. The court disagrees: these details are not in the portions of Brickweg's deposition cited by Turner in her motion to strike, but Brickweg provided this information later in her deposition. *See* Brickweg Dep. 101: 21-22, 102: 1-22, 106: 5-9, 107:18-20, 108: 3-6, 7-8. In addition, HCSC previously disclosed the dates and times of the messages in discovery, so Turner cannot be prejudiced by repetition of information already known to her.

Second, Turner asserts that Brickweg's declaration leaves out key testimony in order to "change or conform the testimony to better suit the Defendant's arguments." Motion to Strike at 4-5. According to Turner, Brickweg's declaration is misleading because it does not note that Turner referred to the FMLA when she called in to report an absence. This argument is immaterial as Brickweg's declaration is not the sole evidence before the court. Moreover, HCSC explicitly stated in its Local Rule 56.1 (a) statement of material facts that Turner mentioned the FMLA when she called Brickweg. *See* HCSC's Rule 56.1 Statement at ¶ 51.

Finally, Turner focuses on a hypothetical that arose during Brickweg's deposition. Brickweg was asked how she would handle an employee who needed a period of time off instead

of a single day.  Brickweg Dep. at 40:2-22.  Brickweg testified that if the employee called in and gave them the necessary information, he or she would be excused for the duration of the time period that they needed off without having to call in each day.  *Id.*  In her declaration, Brickweg addresses Turner's failure to call on a daily basis.  This evidence does not contradict Brickweg's deposition testimony because Brickweg's position is that Turner did not request permission to take five consecutive days off.  Thus, the motion to strike based on alleged inconsistencies is denied.

### B.    Phone Records

As noted above, Brickweg kept notes reflecting the information in the headers for voicemails left by Turner and pulled a log of all incoming calls to her direct telephone line at HCSC from December 8 through December 14, 2004.  Turner contends that Brickweg is not qualified to testify about the voicemail headers or the phone logs and that the phone logs are not admissible.  The court disagrees.

### 1.    Voicemail Headers

Under Federal Rule of Civil Procedure Rule 56(e), "a supporting or opposing affidavit must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Turner asserts that statements in Brickweg's declaration lack foundation and are improper legal conclusions.

Specifically, Turner takes issue with Brickweg's competency to testify that in 2004, the voicemail system automatically recorded the dates and times of each voicemail message.  A witness need not be a telecommunications expert to testify regarding this kind of basic detail, which is easily grasped by anyone who has ever retrieved a voicemail message from a system

that includes a header. Brickweg's position as supervisor and her extensive use of the voicemail system make her competent to testify about that system.

For the same reason, the court rejects Turner's argument that Brickweg cannot testify regarding the voicemail headers because she was disclosed as a fact witness. HCSC identified Brickweg as having "knowledge concerning [her] communications and discussions with Turner and [her] evaluations of [Turner's] performance and attendance . . . [Brickweg] may also have knowledge . . . concerning HCSC's business, employees, and personnel policies and procedures." HCSC's Rule 26(a) Disclosures, § A2. The call log fits easily within these parameters. In addition, it is undisputed that HCSC produced the call log in discovery. The court, therefore, declines to strike the call log.

### 2. Telephone Call Logs

Turner seeks to strike records of calls logged by HSCS. A proper foundation for business records is established if the records: (1) were kept in the course of regularly conducted business activity; and (2) it was the regular practice of that business to make such records. *United States v. Given,* 164 F.3d. 389, 394 (7th Cir. 1999). A custodian or other qualified person must authenticate the records and lay the required foundation. Fed. R. Evid. 803(6). If these requirements are met, the records will be admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.*

Turner contends that the logs lack foundation because Brickweg is not a "qualified witness" and there is no evidence of where the records were produced. A "qualified person" is a person who has knowledge of the procedures used to create and maintain the records. *Collins v. Kibort,* 143 F.3d 331, 338 (7th Cir. 1998).

Here, Brickweg's position as inquiry supervisor of the call center required her to oversee customer service representatives such as Turner. Brickweg was aware that HCSC's telephone and computer system automatically generated call logs. The data included calls to and from office telephone numbers, including the date, time, duration, and telephone number of each incoming and outgoing call, whether the phone at issue was a land line or a mobile device, and the cost of each outgoing call. HCSC used the telephone data for various purposes, including evaluating CSRs, dealing with customer complaints, and budgeting. Brickweg, as well as other inquiry supervisors, were able to monitor CSR calls in real time from their computers.

Although Brickweg may not be able to explain how the system generates data, she is familiar with HCSC's record keeping practices and thus is a qualified witness. *See United States v. LeShore*, 543 F.3d 935, 942 (7th Cir. 2008). Moreover, the records were kept in the regular course of business. Turner's contention that HCSC could have created the records using a word processing system is speculative and does not justify excluding HCSC's business records. For all these reasons, Turner's motion to strike the call log is denied.

C.     **Similarly Situated**

In her declaration, Brickweg notes that she and other unspecified employees took FMLA leave and were not terminated. Turner seeks to strike this statement, contending that Brickweg is not similarly situated to Turner and also failed to identify the other employees at issue. When determining whether another individual is comparable, the court considers, "whether the employee(s) (1) had the same job description, (2) were subject to the same standards, (3) were subject to the same supervisor, and (4) had comparable experience, education and other qualifications." *Sales v. Wis. Dep't of Corrections,* 493 F.3d 913, 923 (7th Cir. 2007).

Brickweg is not similarly situated to Turner because Brickweg was Turner's supervisor and they held two entirely different positions. With respect to the other employees, because they are not named, the court cannot ascertain whether they were similarly situated to Turner. Accordingly, Brickweg's statement that "HCSC employees, including herself, have taken FMLA [leave] and have not been terminated" is stricken. With these rulings in mind, the court turns to the parties' Local Rule 56.1 submissions.

## II. Background

The following facts are undisputed unless otherwise noted.

### A. Turner's Employment at HCSC

Turner began working at HCSC as a customer service representative in February of 2002. With the exception of approximately one month in 2002 or 2003, Turner's shift start time was 8:30 a.m. Turner's job duties included receiving incoming phone calls, answering insureds' questions about their claims and policies, and preparing paperwork regarding those claims. During Turner's employment, HCSC's customer service department was very busy and phones constantly rang. Turner thus understood that it was important for her to be at her desk in order to be available to answer customer calls promptly and to do what was necessary to take care of HCSC's customers.

While employed at HCSC, Turner received a copy of HCSC's employee handbook. The handbook included the following call-in policy: "If you are unable to report to work or to report to work on time, you must personally telephone management or management's designee, unless you are hospitalized or management grants an exception." The policy specified that shift employees had to call within one hour after their shift was scheduled to begin. Turner

understood that this was the normal rule during her employment, and that the policies were in place to ensure that the phones were adequately covered.

For FMLA leave, however, the policy provided that if an employee knew she was going to be absent for a specific number of days, she could provide advance notice regarding the number of days she would be out of the office. If she did so, she would then not have to call in on a daily basis to notify HCSC of her absence.

## B. Requesting FMLA Leave

HCSC's FMLA policy requires employees to apply for leave 30 days in advance "or as soon as practical and possible, of the need for time off that might qualify for FMLA." FMLA Policy at 3. It further states that employees must provide notice:

> every time you have an intermittent FMLA-related absence, in advance of your absence or, in any case, not later than within 48 hours of your return to work.
>
> You must also notify your management in advance (as soon as possible and practical) of your need for time off that might qualify for FMLA. You must notify management when you will be away from work and must follow all department and corporate absence notification procedures . . . . You can take your approved FMLA leave in the following ways: . . . . Intermittent time off, such as for doctor's appointments or time related to an illness resulting from a serious health condition.

*Id*.

## C. Turner's Medical Condition

Turner testified that approximately ten years ago, she was involved in a car accident where she injured her back. Her physician, Dr. Mark J. Schneider, testified that Turner had degenerative back disease with chronic pain due to the car accident. Prior to Brickweg, Turner's previous supervisors, Jo Ellen Castro and Tish Serano, knew that Turner had a back condition. Brickweg was also aware that Turner had issues with her back, and explained that she realized Turner had a back problem shortly after she became Turner's supervisor in August of 2004,

because Turner had a "pillow thing" in her chair at work and she mentioned something about her back problem.

### 1.    Dr. Schneider

Dr. Schneider testified that the limitations on the things Turner can do on a day to day basis are chronic (not permanent), and that her limitations have not changed significantly since he began treating her.  He also testified that "activities of daily living, taking care of her child" were significantly affected by Turner's condition, but Turner could take care of herself, perform manual tasks, see, hear, speak, breathe, and reproduce.  In addition, he opined that Turner could walk, but not for extended periods of time, and that Turner could sit down to perform various tasks if she occasionally took a break and got up to walk around.

He also stated that he "might have told [Turner]" that she "might end up that way [totally disabled]".  Schneider Dep. at 40-41.  However, he could not recall when this conversation might have taken place.  According to Dr. Schneider, Turner would have been able to work in December of 2004 with accommodations, and having some time off of work because of her back condition flare ups would have been one of those accommodations.

Dr. Schneider never declared Turner disabled and unable to work, and opined that she was not totally and permanently unable to work.  He also stated that he believed that the Social Security Administration was the entity that could make a formal determination when and if Turner became totally disabled and permanently unable to work.

### 2.    Turner's Assessment of Her Condition

Turner testified that as a general matter during her tenure at HCSC, she could sit (assuming she had the opportunity to stand periodically), walk for 15-20 minutes at a stretch, lift up to 20-25 pounds, use the telephone, computer and a calculator, and care for herself.

However, Turner testified that on "bad days," if she was sitting for more than five or ten minutes, she needed to be able to "move, to lie down, or [to] change chairs." Turner Dep. at 169:8-9. She further testified that she could sit for ten or fifteen minutes at a time on "bad days," and that she needed to be able to stand up and move. *Id*. at 170:9-14. Turner testified that during her employment at HCSC, she could drive a car "unless [she] was having a really bad day." *Id*. at 67:8-11.

When she had a flare-up, her ability to lift was severely restricted, and she could not stand to do dishes, or cook a meal. In addition, while she was able to use the bathroom on her own, she needed help to get there.

Except for when she had a flare up, during her employment at HCSC, Turner was able to work and easily performed the tasks of a customer service representative. Again, except for days when she had a flare up, Turner occasionally took painkillers to treat her medical condition, and was able to work while medicated. When Turner's back was worse, she walked with a noticeable limp. She also kept a heating pad at her desk.

Turner never told anyone at HCSC that she was totally disabled or permanently disabled and unable to do any work of any kind. However, Turner asserts that a couple of months or a month before her termination from HCSC, she told Brickweg that she "might at some point become permanently disabled and unable to work." Turner Dep. at 94:9-14, 96:17-21. Turner testified that she did not say it was definite that she would be permanently disabled and unable to work because in fact it was not definite. Brickweg denies that Turner ever told her that she would become permanently disabled and unable to work or that she intended to apply for long-term disability benefits.

### D.      Turner's Disciplinary Record at HCSC

On December 2, 2002, Turner's then supervisor, Castro, issued Turner a written warning for her excessive unscheduled paid time off ("PTO").   Turner had 125.05 hours of unscheduled PTO from July through November 2002.  Turner was advised and understood that any further unscheduled PTO in the next six months would result in additional corrective action, including possible termination.  Turner signed the written warning, which accurately summarized the dates she missed work and the amount of time that she missed on each of those dates.  Turner admits that the amount of unscheduled PTO is correct and that she received the warnings, but contends that her supervisors had an affirmative duty to advise her of her rights under the FMLA.  According to Turner, she eventually learned about the FMLA from a co-worker, not from any of her supervisors.

In Turner's February 24, 2003 performance appraisal, Castro noted that Turner continued to have attendance and unscheduled PTO issues.  Turner reviewed and signed the appraisal, which she considered to be a fair and accurate review of her performance.

In Turner's August 1, 2003 performance appraisal, her then-supervisor LaDonna Daye noted that Turner needed to focus on her attendance and improve it.  Turner reviewed and signed the appraisal, which she considered to be a fair and accurate review of her performance.

Daye reinstated Turner to a written warning on August 8, 2003 because Turner accumulated 177 hours of unscheduled PTO.  Turner was advised that any further unscheduled PTO in the next six months would result in additional corrective action, including possible termination.  Turner signed the written warning and agrees that it fairly and accurately described the events reflected on it.

On March 2, 2004, Turner's then-supervisor, Kosarek, orally counseled Turner about the three occurrences, or 24 hours of unscheduled PTO, that Turner had accumulated in the first two months of the year. Kosarek explained to Turner that attendance directly impacts HCSC's goal of premier customer service. Turner agrees that the memorandum Kosarek prepared documenting the oral counseling she gave Turner fairly and accurately described their discussion.

On April 4, Kosarek issued Turner another written warning for additional occurrences of unscheduled PTO in the three months since Kosarek's oral coaching. Turner was again advised that any further unscheduled PTO in the next six months would result in additional corrective action, including possible termination. Turner signed the written warning, which she agreed fairly and accurately described the events that led to it.

On July 21, Kosarek placed Turner on probation based on her excessive occurrences of unscheduled PTO. Turner was advised that any further unscheduled PTO in the next three months would result in additional corrective action, including possible termination. Turner signed the probation notice, which she agreed fairly and accurately described the events that led to her probationary status.

Turner believed that all of these actions were unfair because the unscheduled PTO was due to her back problems. Thus, after signing the July 21th probation notice, Turner threw it at Kosarek, and told Kosarek that she would go Human Resources to apply for FMLA leave, at which point Kosarek would have to take her off probation. Turner thereafter applied for leave under the FMLA on July 28, 2004.

On Wednesday, August 11, 2004, Turner asked Kosarek what would happen if she called in on Monday, August 16, and whether she would be fired. Kosarek advised Turner that it might result in additional discipline given that she was already on probation.

It is undisputed that Turner failed to show up for work or call in to report her absence on August 16 and 17, 2004.

When Turner was absent from work on August 16, Kosarek informed Elaine Brown in HCSC's Occupational Health department about Turner's August 11th inquiry as to what would happen if she called in sick on August 16, as well Turner's July 21st statement that Kosarek would have to take Turner off probation once her application for leave under the FMLA was approved. Kosarek's purpose for contacting Brown was to alert her to the unusual circumstances surrounding Turner's latest absence, particularly in light of her recent request for leave under the FMLA (which had not yet been approved) and to seek guidance and assistance in how to handle the situation. Kosarek did not recall talking to anyone in HR in response to the email.

On August 18, Turner came in to work, but left early without directly notifying a member of management; according to Turner, she notified Brickweg's assistant that she was leaving. Turner testified that she filled out an FMLA form and left it on Brickweg's desk.

On August 19 and 20, Turner again failed to show up for work or call in to report her absence. As Turner's supervisor as of August 20, Brickweg could have recommended Turner's termination based on the events of August 16-20. Instead of terminating Turner, however, Brickweg issued her a written warning for her unscheduled absences and failure to call in pursuant to HCSC's call-in policy. Turner was warned that any further violations of the call-in policy could result in immediate termination of employment. Turner understood that it was her responsibility to notify HCSC management when she was going to be absent from work and that

she must follow all department and corporate call-in procedures.  Turner signed the written warning.  Turner nevertheless asserts that she provided timely notice because under the FMLA, she was required to notify HCSC of her absence as soon as possible but no later than within 48 hours of her return to work.

On September 3, Turner identified one of her short-term career goals as "to improve [her] attendance and maintain that."  On September 24, Brickweg discussed with Turner the need to improve and maintain a good attendance record.  Turner contends that her absences were due to her back problem, as opposed to a lack of attention to her attendance.

On October 1, Brickweg issued a warning to Turner because her quality rating was below the minimum standard, albeit by a slight amount.  Brickweg also placed Turner on a performance improvement plan ("PIP") and advised her that if her quality rating did not improve to an acceptable level over the next three months, she could be further disciplined and possibly terminated.  Turner concedes that the PIP accurately reflected her performance and that she was treated fairly with respect to the standard by which she evaluated.

### E.     Turner's Approvals for Intermittent Leave

On July 28, 2004, Turner applied for intermittent time off work under the FMLA for the period of July 26 through October 26, 2004, and her application was approved shortly thereafter.

On or about October 15, 2004, Turner applied for intermittent time off work under the FMLA for the period of October 27 through December 31, 2004.  Turner's November 10, 2004, intermittent leave approval was for ten or fewer consecutive work days.

### F.     Circumstances Leading to Turner's Termination from HCSC

HCSC's telephone records reflect incoming calls to Brickweg from Turner's home telephone number on December 8, 9, 11, 13, and 14, 2004.

-14-

The HCSC voicemail system automatically records the date and time of the message on the voicemail header (the preface to the message). According to Brickweg, she noted and kept contemporaneous records of the date and time of Turner's calls in December of 2004 beginning on December 8th. Turner disputes that Brickweg took notes about the voicemail messages Turner left for Brickweg, but does not point to any support – other than her own speculation – for her assertions about what Brickweg did when she received a voicemail message from her.

Brickweg also pulled a log of all incoming calls to her direct telephone line at HCSC from December 8 through December 14, 2004. These records show that no calls were received on Brickweg's direct line from the number (815) 873-9389 prior to 9:30 a.m., which was one hour after Turner's 8:30 a.m. shift start time, on December 8, 9, 10, 13, or 14, 2004. Turner's contacts with Brickweg on these dates are discussed in more detail below.

### 1. December 8

Turner testified that her back condition and pain had been building up in the days prior to December 8, 2004, and on that morning she "had to figure out what to do about it because the pain was so bad." Turner Dep. at 44:10-12. The phone log shows that Brickweg received a call from Turner's land line home phone at 11:25 a.m., and that the first call Brickweg received on December 8, 2004, was made at 9:32 a.m. Brickweg's records of Turner's Wednesday, December 8 call reflected that at 11:30 a.m., three hours after her scheduled shift start time, Turner left Brickweg a voicemail message stating that she would not be in to work that day. Brickweg claims that Turner did not specify that she would be out for a period of days.

At her deposition, however, Turner testified that she called Brickweg between 6:00 – 7:00 a.m. on Wednesday, December 8, 2004, using her fiance's cellphone before her shift started, and left a voicemail message stating that she "was going to be off for a week because of

the FLMA." Turner Dep. Vol. 1 at 33.  HCSC's counsel and Turner then had the following

colloquy:

> Q:   In that message you left on December 8, 2004, did you tell Brickwag
>      words to the effect that you would be absent that day?
>
> A:   Yes.  And I let her know that I would probably be absent for about a week.
>      The time allotted by – the time allotted by the FMLA.
>
> Q:   Are you saying that you mentioned in the voicemail message that this was
>      time allowed by the FMLA?
>
> A:   No.  I think I probably would have said, you know, I'm calling to let you
>      know my back is worse.  It's probably going to be a week because I have
>      to figure out what I'm going to have to do to get it taken care of.
>
>      I think I let her know that I was going to look into getting another shot and
>      things of that nature.  I let her know it was going to be ongoing, not
>      something acute that happened that morning, but I had been having
>      trouble building up to that day and I was going to have to figure out what
>      to do because it was so bad.

Turner Dep. Vol. I at 43-44.  Later in her deposition, Turner testified that she told Brickwag on

December 8, 2004, that she would be "out for a week" due to the FMLA.  *Id*. at 60-61.

Turner testified that she referenced the FMLA in her December 8 message; she has never

claimed that she referred to the ADA.  Brickweg testified that when Turner called in, "all she

said was she was calling in, that she would not be in, and that it was FMLA."  Brickweg Dep. at

100.

### 2.    December 9

HCSC does not presently dispute that on December 9th and 10th, 2004, Turner was

unable to work because of the pain caused by her back condition.  On Thursday, December 9, at

11:59 a.m., approximately three and a half hours after her scheduled shift start time, Turner

called and left a voicemail message for Brickweg.  Turner admits that she placed this call in the

-16-

afternoon, but asserts that she called to let Brickweg know that her back was still bothering her and she was trying to get a shot to treat it. Brickweg testified that Turner said she would not be in to work that day. She also testified that "[e]very day that she called in it was, I can't tell you verbatim, but it was that she wasn't going to be in and that it was FMLA." Brickweg Dep. at 102.

### 3. December 10

On Friday, December 10, Turner did not show up for work or call in to report that she would be absent. According to Turner, she did not need to do so because she had already told Brickweg that she was taking intermittent FMLA leave.

### 4. December 11

December 11, 2004 was a Saturday, and Turner was not scheduled to work on that day. Turner called at 12:28 p.m. and left a voicemail message for Brickweg. According to Brickweg, Turner called to retroactively report her absence from the previous day. According to Turner, however, she called to let Brickweg know that her condition had not improved.

### 5. December 13

On Monday, December 13, at 11:18 a.m., nearly three hours after her scheduled shift start time, Turner called and left a voicemail message for Brickweg. Brickweg testified that Turner called to state that she would not be in to work that day. In contrast, Turner testified that Brickweg knew that she was not coming into work because she told her last week, and that she was merely calling to provide an update on her condition.

### 6. December 14

On Tuesday, December 14, at 2:59 p.m., approximately six and a half hours after her scheduled shift start time, Turner called and left a voicemail message for Brickweg. Once again,

the parties dispute what Turner told Brickweg: Brickweg testified that Turner told her she would not be in to work that day, and Turner contends that she called to give Brickweg an update and to let her know that she would be returning to work the following day.

### G.    Turner's Termination

Brickweg's contemporaneous records of each of Turner's voicemail messages, as reflected in the termination notice she later prepared, correspond within minutes to HCSC's records of the incoming calls to Brickweg's direct line from the number (815) 873-9389 on December 8 through 14, 2004.

Brickweg recommended, and Senior Supervisor Glenda Woodard and manager Jill Firch approved, the termination of Turner's employment effective December 15, 2004. The proffered reason was Turner's failure to follow HCSC's call-in policy to report her unscheduled absences from December 8 through 14, after having been disciplined for violating the same policy in August of 2004. Brickweg testified that she "would have mention[ed] that [Turner] had called in FMLA" but denied that Turner had indicated that she was taking more than a single day off at a time. Brickweg Dep. at 128:13-17

Based on her notes of Turner's voicemail messages, Brickweg prepared a termination notice, which outlined the dates and times of Turner's calls over the previous five workdays. As noted above, the parties agree on the date and time of all of the calls except the December 8th call, and dispute what Turner said when she called in. The termination notice reflects Brickweg's version of the date and time of the calls, as well as her version of what Turner said.

On December 15, Brickweg met with Turner and informed her that her employment was terminated because she failed to follow the company's call-in policy. Brickweg gave Turner a copy of the termination notice that she had prepared in advance of their meeting. Turner

understood that the decision to terminate her employment had been made in advance of the December 15 meeting. Turner believed this decision was improper, based on her position that she had called in to report that she would be taking intermittent FMLA leave and thus was not required to call in every day. She thus told Brickweg that she did not understand why she was being fired and that she thought she was covered by the FMLA.

### H. Requests for an Accomodation

According to Brickweg, Turner never requested from Brickweg, or to Brickweg's knowledge from anyone else at HCSC, a reasonable accommodation for her back condition pursuant to the ADA. Turner disagrees, asserting that she applied for intermittent leave under the FMLA so she could address her back problems and that Brickweg knew that she needed time off to go to the doctor and to allow the swelling in her back to go down.

HCSC contends that prior to Turner's termination, she never tried to have a conversation with her supervisors about providing some type of accommodation other than intermittent leave under the FMLA. Turner denies that she did not ask for an accommodation, and in support, states that she was treated unfairly because when she was absent from work and, as a result, got placed on probation, she did not know about the FMLA.

Turner testified that her December 15 termination meeting and an appeal letter she claims to have sent to Senior Supervisor Glenda Woodard a few days later were the only times she complained about or opposed any unlawful conduct by HCSC, and that she understood the decision to terminate her employment had already been made before the termination meeting.

Turner admits that she returned to HCSC on December 15 intending to work, and after being terminated that same day, she sought other employment, intending to work indefinitely.

### III. Discussion

Turner contends that HCSC violated the ADA by terminating her due to her disability (Count I), failing to accommodate her disability (Count II), and retaliating against her after she exercised her rights under the ADA (Count III).  She also argues that her termination violated the FMLA (Count IV) and that HCSC retaliated against her for exercising her rights under the FMLA (Count V).  Finally, she asserts that HCSC terminated her to deprive her of long-term disability benefits in violation of ERISA (Count VI).  HCSC seeks summary judgment as to each of these claims.

### A.      Standard on a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti v. Qualex, Inc.*, 970 F.2d at 365;  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a "genuine" material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See id.*; *Celotex Corp. v. Catrett*, 477 U.S. at 322.

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *See Sarsha v. Sears*, *Roebuck, & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

**B.     ADA**

**1.     Disparate Treatment (Count I) & Failure to Accommodate (Count II)**

To establish a prima facie case of disparate treatment under the ADA, Turner must point to evidence that, if believed, would show that: (1) she is disabled within the meaning of the ADA; (2) she was meeting her employer's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees received more favorable treatment). *See, e.g., Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005). HCSC begins by vigorously contending that Turner is not is a qualified person with a disability. The court need not address this argument as even if Turner's flare-ups rose to the level of a disability under the ADA, she cannot establish a prima facie case because the record shows that she was not meeting HCSC's legitimate expectations as a matter of law.

The Seventh Circuit has recognized that "our court, and every circuit that has addressed this issue, has held that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs." *E.E.O.C. v. Yellow Freight System, Inc.*, 253 F.3d 943, 948 (7th Cir. 2001); *see also Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999) (declining to "establish[] a hard-and-fast rule that no absences

from work need be tolerated" but holding that no business is "obligated to tolerate erratic, unreliable attendance").

Turner was aware that HCSC required all sift employees to call in no later than one hour before their shifts started. Turner contends that she placed a timely call on December 8, 2004, despite the fact that the phone logs do not reflect any such call. But even assuming she did call in properly on December 8th, she concedes that she did not call in within one hour of her shift start time for the rest of the week. Her explanation is that she was not required to do so because she allegedly advised Brickweg that she was taking FMLA leave for the entire week.

In opposition to HCSC's motion for summary judgment on her ADA discrimination and failure to accommodate claims, Turner asserts that when she allegedly told Brickweg on December 8, 2004, that she would not be in for a week due to her back problems, she was in fact requesting an accommodation under the ADA, so she was excused from complying with HCSC's call-in policy. This argument is unavailing.

First, Turner testified that she referenced the FMLA in her December 8 message, but never claimed that she referred to the ADA. As a general rule, a plaintiff must request an accommodation before liability under the ADA can attach. *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). Turner does not explain how, based on her alleged invocation of the FMLA on December 8th when she says she told Brickweg that she was taking the week off pursuant to the FMLA, that HCSC could have reasonably known that she was attempting to begin the interactive process under the ADA.

Second, even if HCSC had somehow been able to divine that when Turner allegedly said she was taking the week off pursuant to the FMLA and her previously granted intermittent leave, she also meant that she required as much time as necessary for her back flare-up to resolve as an

accommodation under the ADA, she would still not be able to survive HCSC's motion for summary judgment. Time off may be a reasonable accommodation. However, an employee is not entitled to receive unlimited time off in her sole discretion. *See E.E.O.C. v. Yellow Freight System, Inc.*, 253 F.3d at 950 ("requests for unlimited sick days, if needed, without being penalized, are not reasonable as a matter of law") (internal quotations omitted); *see also Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d at 899 n.9 ("the only imaginable accommodation would be an open-ended schedule that would allow [the plaintiff] to come and go as he pleased. We would be hard-pressed to imagine a manufacturing facility that could operate effectively when its employees are essentially permitted to set their own work hours, and we thus reject such a schedule as an unreasonable accommodation under the circumstances of this case"); *Waggoner v. Olin Corp.*, 169 F.3d at 485 (holding "as a matter of law" that employee's desire "to miss work whenever she felt she needed to and apparently for so long as she felt she needed to" was not a reasonable accommodation for someone employed as a production worker).

Turner is essentially contending that HCSC was required to give her as much time off as she requested, upon demand. As discussed above, this is not a reasonable accommodation. Thus, even if Turner had asked for the accommodation she now contends HCSC should have offered, HCSC would have been under no obligation under the ADA to approve unlimited amounts of time off, regardless of whether the time off had a correlation to Turner's back problem. For these reasons, HCSC is entitled to summary judgment on Turner's disparate treatment and failure to accommodate claims (Counts I and II, respectively).

### 2.  Retaliation

Turner contends that HCSC retaliated against her by terminating her after she attempted to take time off in December of 2004, as an accommodation for her back condition.  Under the indirect method of proof, a plaintiff must show that she: (1) engaged in protected activity; (2) was subject to an adverse employment action; (3) was performing her job satisfactorily; and (4) no similarly situated employee who did not engage in protected activity suffered an adverse employment action.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 788 (7th Cir. 2007).  Turner has not pointed to a similarly situated employee with no health problems who was treated better, so she cannot proceed under the indirect method.

Thus, the court will view Turner's retaliation claim through the lens of the direct method.  To state a claim for retaliation under the direct method, Turner must show: (1) that she engaged in a statutorily protected activity; (2) that she experienced an adverse employment action; and (3) that these elements are causally connected.  *See id.* at 786.

Turner first appears to be arguing that HCSC retaliated against her because she complained about the decision to terminate her employment and asserted that it was treating her unfairly due to her back problem.  Turner concedes that HCSC decided to terminate her before the December 15, 2004, meeting when it advised her of this decision.  Thus, she cannot satisfy the third prong (causal connection) because HCSC could not have terminated her in order to retaliate against her based on actions that had not yet occurred (*e.g.*, her complaints about her termination at and after the December 15th meeting).

Turner next asserts that HCSC terminated her in order to retaliate against her because she had requested time off under the ADA.  This presents a problem for Turner under the second prong of the indirect test (statutorily protected activity).  First, the record does not show that

Turner ever invoked the ADA. Even viewing the record liberally and even assuming that Turner was disabled or regarded as disabled under the ADA, Turner expressly relied on the FMLA, and concedes that she did not mention the ADA when she called on December 8th.

Turner also did not invoke the ADA by attempting to interact with HCSC about an accommodation. Instead, (accepting her version of the facts) she advised HCSC that she was taking a week off pursuant to the FMLA and her previously approved intermittent FMLA leave. As discussed above, to the extent that HCSC was on notice that Turner wanted to engage in the interactive process to determine what reasonable accommodations would be suitable, it was required to participate in that process. However, on this record, it cannot be faulted for failing to appreciate that Turner was, in fact, relying on the ADA when she took the fateful last week of FMLA leave. *See generally Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001) ("a reference to being 'sick' not only withheld important information from the employer but likely threw it off the scent. Certainly it did not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable").

In short, the record does not show that Turner ever requested or took leave under the ADA. Thus, HCSC could not have retaliated against her for requesting or taking leave under the ADA. Accordingly, HCSC is entitled to summary judgment on Turner's ADA retaliation claim (Count III).

## C.    FMLA

The FMLA is at the heart of Turner's case. She argues that her termination violated the FMLA (Count IV) and that HCSC retaliated against her for exercising her rights under the FMLA (Count V). For the following reasons, both FMLA claims survive summary judgment.

### 1.    Did Turner's Termination Violate the FMLA?

Under the FMLA, employers must allow employees up to twelve weeks of leave per year if the employee asks for leave for a purpose specified in the statute, such as addressing a "serious health condition."  *See* 29 U.S.C.A. § 2612(a)(1)(D).  Covered employers may not interfere with, restrain, or deny "the exercise of, or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C.A. § 2615(a)(1); *see also Thomas v. Pearle Vision, Inc.,* 251 F.3d 1132, 1139 (7th Cir. 2001).  Upon her return to work, the employee is entitled to reinstatement to her position or a position equivalent in benefits, pay, and other terms and conditions of employment.  29 U.S.C. § § 2614(a)(1).

As stressed by HCSC, the FMLA regulations provide that "[a]n employer may . . . require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave."  29 C.F.R. § 825.302(d).  Moreover, HCSC's rule requiring employees to call HCSC within one hour after their shift started if they were going to be absent is a "usual and customary" condition precedent to taking FMLA leave.  *See Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709-10 (7th Cir. 2002).

HCSC argues that it was not obligated to reinstate Turner after she violated its call-in rule.  According to HCSC, even if the December 8th call is off the table due to a factual dispute (because Turner contends she called prior to the start of her shift despite phone records and other evidence to the contrary), it is undisputed that Turner failed to place timely calls for the remainder of the week and thus was not entitled to be reinstated when she returned to work. HCSC also stresses that it "need not conclusively prove" that Turner violated the call-in rule because even an "honest suspicion" that Turner violated the call-in rule is enough to defeat her FMLA claim.  *See Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681 (7th Cir. 1997).

The problem with this argument is that the factual dispute about the December 8th call goes beyond the time at which Turner placed the call. Turner also contends that she told Brickweg that she would be out the entire week, and that she called Brickweg back each day during her week off to provide updates on her condition. HCSC's summary judgment motion is based on evidence indicating that Turner told Brickweg that she would "probably" be out for "about a week." If Turner had indeed made this kind of indefinite statement to Brickweg, she would have been required to place a timely call each day of her absence, and her failure to do so would doom her FMLA claim. The record, however, is far more equivocal than HCSC suggests. Thus, HCSC's motion for summary judgment as to Turner's FMLA claim (Count IV) is denied.

## 2. Did Turner's Termination Constitute Retaliation Under the FMLA?

Covered employers may not interfere with, restrain, or deny "the exercise of, or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C.A. § 2615(a)(1); *see also Thomas v. Pearle Vision, Inc.,* 251 F.3d 1132, 1139 (7th Cir. 2001); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999). To establish a prima facie case of retaliation under the FMLA, Turner must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse act after this activity; and (3) there was a causal link between the protected activity and the adverse action. *See King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999). If she carries this burden, HCSC must point to a legitimate, non-retaliatory reason for Turner's discharge. *See id*. If HCSC does so, Turner can survive summary judgment only if she points to evidence showing that HCSC's stated reason was pretextual. *See id*.

The court must accept Turner's version of the facts at this stage in the proceedings, and cannot weigh the competing evidence offered by the parties. Turner has pointed to evidence indicating that on December 8, 2004, she told Brickweg, in a timely manner, that she would be

out all week pursuant to previously approved FMLA leave.  This is enough to state a prima facie case of retaliation.  It is also enough to entitle Turner to a trial, because HCSC's proffered reason for Turner's discharge – her failure to comply with the call-in policy every day of the week that she was absent – is unconvincing because the trier of fact could ultimately accept Turner's testimony that she in fact placed a timely call on December 8th to tell Brickweg that she would be out all week.

Of course, the trier of fact might find that HCSC's phone records are conclusive.  It also might decide that Turner's call was timely but equivocal, thus requiring her to place a timely call for each day of her absence.  These are, however, questions for another day.  Thus, HCSC's motion for summary judgment on Turner's FMLA retaliation claim (Count V) is denied.

**D.     ERISA**

Finally, Turner asserts that HCSC terminated her to deprive her of long-term disability benefits in violation of ERISA (Count VI).  Under § 510 of ERISA, it is unlawful to "discharge . . . or discriminate against a participant or beneficiary for exercising any right to which [s]he is entitled under the provisions of an employee benefit plan."  29 U.S.C. § 1140.  Nevertheless, an employee's loss of benefits due to an adverse employment action does not automatically amount to a violation of § 510.  *See Isbell v. Allstate Insurance Co.*, 418 F.3d 788 (7th Cir. 2005); *see also Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 127 (7th Cir. 1991) ("no action lies where the alleged loss of rights is a mere consequence, as opposed to a motivating factor behind the termination").  Instead, to succeed on a § 510 claim, a plaintiff must show that her employer acted with the specific intent to prevent her from using her plan benefits.  *See Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998); *see also Teumer v. General Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994) (summary judgment must be denied if the record, construed in

the light most favorable to the plaintiff, supports the conclusion that the "desire to frustrate attainment or enjoyment of benefit rights contributed toward the employer's decision").

The court's analysis begins and ends with the lack of any evidence linking the termination of Turner's employment to a desire to prevent her from obtaining long term disability and health insurance benefits. According to Turner, her employer knew that she had a back problem and thus had a cost-cutting motive for terminating her employment. Based on this alleged motive, Turner asserts that she is entitled to a trial on her ERISA claim. The court disagrees, as this purported link is based on pure speculation. *See Lindemann v. Mobil Oil Corp.*, 141 F.3d at 297-98 (discussing the plaintiff's obligation to demonstrate that her employer specifically intended to interfere with her enjoyment of ERISA benefits); *see also Little v. Cox's Supermarkets*, 71 F.3d 637, 643-444 (7th Cir. 1995) (the fact that an employer might realize savings by terminating an employee and thereby preventing her from claiming ERISA benefits, without more, "cannot be viewed realistically as a motivating factor in [the employee's] discharge")*; Hainke v. Gleeson, Sklar, Sawyers & Cumpata LLP*, 71 F.Supp.2d 885, 892 (N.D. Ill. 1999) (the fact that plaintiff's employer learned of her medical condition and that she might need heart surgery within one month prior to her termination "lack[ed] the causal element of a 'conscious decision' to interfere with [the employee's] benefits"). Accordingly, FCSC's motion for summary judgment as to Turner's ERISA claim (Count VI) is denied.

## IV. Conclusion

For the above reasons, Turner's motion to strike [#70] is granted in part and denied in part. Specifically, for the purposes of HCSC's motion for summary judgment, Brickweg's statement that she and other employees took FMLA leave and were not fired is stricken, and the remainder of Turner's motion to strike is denied. In addition, HCSC's motion for summary

judgment [#76] is granted in part. Specifically, HCSC's motion is denied as to Turner's FMLA claims and granted as to her ADA and ERISA claims. Finally, Turner's Illinois Personnel Record Review Act claim is dismissed for failure to exhaust.

This matter is set for status on May 14, 2009, at 11:00 a.m. At that time, the parties should be prepared to agree to a firm trial date. The court also thanks counsel for their carefully prepared Local Rule 56.1 statements and their inclusion of pinpoint citations for all cited testimony.


DATE:   May 4, 2009                              _____
                                                 Blanche M. Manning
                                                 United States District Judge